

# NUMBER 13-23-00271-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

DONALD L. BOSON, Appellant,

**v.**

THE STATE OF TEXAS, Appellee.

## ON APPEAL FROM THE 347TH DISTRICT COURT
## OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Benavides, Tijerina, and Silva**
**Memorandum Opinion by Justice Benavides**

A jury convicted appellant Donald L. Boson of aggravated sexual assault of a child,

a first-degree felony, and assessed his punishment at twenty-two years' imprisonment.

*See* TEX. PENAL CODE ANN. §§ 12.32(a), 22.021(a)(2)(B). Boson raises three issues on

appeal: (1) the evidence was legally insufficient to support his conviction; (2) the trial court

erred by failing to grant a mistrial after a witness testified about inadmissible extraneous offense evidence; and (3) his trial counsel's performance was constitutionally deficient. We affirm.

## I. BACKGROUND

In December of 2018, Boson was indicted on two separate counts of aggravated sexual assault of a child under the age of fourteen. Specifically, Boson was accused of digitally penetrating the female sex organs of sisters Alison and Amanda[1] on or about February 20, 2010. *See id.* § 22.021(a)(2)(B).

The evidence presented at trial established that Alison and Amanda were born in 2002 and 2004, respectively. After their parents separated in 2011, the sisters would spend every other weekend at Father's home. The girls shared a bedroom on one end of the house, next to their older brother's bedroom. Father's bedroom was at the opposite end of the house.

For a period, Boson and Father were close friends, and Boson would frequently come over to Father's place on the weekends to hang out. Sometimes, either because it was too late or Boson was too intoxicated to drive home, Boson would spend the night at Father's residence, including nights while the sisters were visiting. According to Father, on these occasions, he would offer Boson the couch in the living room, which is in the middle of the home. Father and Boson had a falling out in 2012 and did not speak afterwards.

---

[1] We have assigned pseudonyms to the complainants to protect their privacy. *See* TEX. CONST. art. 1, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"). To further protect their identity, we will refer to the complainants' parents as Father and Mother. *See id.*

2

In 2018, Amanda made an outcry to Mother. According to Mother, Amanda awoke from a nightmare one morning and came to her "distraught" and "crying." Amanda asked Mother if she remembered Boson and then told her "that something had happened." Mother said she began asking Amanda questions, and Amanda told Mother that Boson touched "her private areas" or "down there," which Mother understood to mean Amanda's vagina. She told Mother that she was in her brother's room watching "Sponge Bob" on television and eating "chicken nuggets," when Boson came into the room, "lays her down, pulls her panties down, spreads her legs open, and starts taking pictures of her."

Mother called the police, and a responding officer asked her whether Alison had made any similar accusations. Mother then asked Alison if Boson "had touched her," and Alison "started crying and nodded her head yes." According to Mother, Alison alleged that Boson walked in her bedroom "and put his hands in her pants and started touching her[,] putting his fingers in her vagina." Alison told Mother that she pretended to be asleep, hoping Boson would stop, but he continued until he heard Father's bedroom door open. Alison also told Mother that she witnessed Boson sexually assaulting Amanda.

During the ensuing investigation, the sisters were taken to the local Children's Advocacy Center for forensic interviews and then to Driscoll Children's Hospital for sexual assault exams. The medical records from those exams were admitted into evidence without objection. Penny Gaddis, the sexual assault nurse examiner (SANE) who conducted those exams, had retired from the hospital at the time of trial and was apparently unavailable to testify. Instead, Sandra Pardo, another SANE from the hospital, testified to the contents of the medical records. According to Amanda's medical records,

3

she provided Gaddis with the following statement, which Pardo read into the record without objection:

> [E]arly one morning, me and my brother would watch TV in his room. I sat on the floor, turned on the TV, [and] the man, [Boson], was asleep in the bed in my brother's room. He woke up. I don't remember my clothes—how I got the clothes off. He started touching me (patient indicates female sexual organ by pointing) with his hands, just his hand inside. I said stop it, [and] he backed away. He started taking pictures with his phone.

Amanda reported to Gaddis that this incident happened "[a]bout six or seven years ago." In another section of the medical history used to document the type of alleged assault, Gaddis marked a series of boxes indicating that it was "unknown" whether penetration had occurred. The State asked Pardo why Gaddis would mark "unknown" when she had quoted Amanda as using the word "inside" to describe the touching. Pardo speculated that Gaddis probably "was not 100 percent sure" whether penetration had occurred.

Pardo also testified about the medical records from Alison's exam, again reading the narrative that Alison allegedly provided to Gaddis:

> [W]hen I was about eight or nine, I had been touched by my dad's friend, [Boson]. I was laying down on top of my bunk bed. I was asleep. I heard someone come into my room. I felt the blanket move, and then I felt a hand go under my shorts. He touched in my vagina with his fingers. I didn't know what it was, so I kept it in. I was scared. I didn't know it happened to my sister.

Like Amanda's medical records, Gaddis marked "unknown" to indicate whether any penetration had occurred.

Pardo also testified that while an exam is being conducted, a social worker meets with the patient's family members and conducts a psychosocial assessment. The contents of these assessments are recorded by the social worker and included in the

4

patient's medical records. As part of the assessment, the family member is asked to provide a history of the alleged abuse. In this case, Mother was interviewed by Lisa Porterfield. At one point during Pardo's testimony, the State asked her to read aloud a portion of Alison's assessment. As pertinent here, Pardo testified that Mother said, "A couple of years ago [Alison's] friend told her that [Boson] is a registered sex off—." Boson's counsel interjected with an objection before Pardo finished saying "offender."

During a hearing outside the presence of the jury, Boson's counsel and the prosecutors agreed that they had jointly reviewed the medical records prior to trial for the purpose of redacting any inadmissible evidence, including any reference to Boson as a registered sex offender. Boson's counsel said, "I thought all mention of that w[as] redacted." One of the prosecutors remembered that specific line being redacted, but the second prosecutor reasoned that there must have been a collective oversight with regard to that item.[2] The trial court denied Boson's request for a mistrial and then asked whether he wanted the court to give the jury an instruction to disregard the testimony or just "ignore it," so as not to bring unwanted attention to the testimony. As one curative measure, the parties agreed to a post-admission redaction of the statement from Alison's medical records. The version of the exhibit before our Court, which would have been the same version available to the jury during deliberations, reflects that the redaction was made. After further discussion, the parties agreed to the following instruction, which was given to the jury when trial resumed:

At this time, ladies and gentlemen, before we rested or before we—we

---

[2] We note that Amanda's psychosocial assessment contained the same allegation but had been redacted from the copy that was admitted into evidence.

5

broke there was testimony that was read. There was an objection to it, so at this time I am going to indicate to you please disregard the witness's last statement where he—she indicated something about a registered sex offender. Mr. Boson is not a registered sex offender so please disregard—disregard that testimony.

Penny Green, a forensic interviewer with the local Children's Advocacy Center, testified that it is not uncommon for child victims of sexual abuse to make a delayed outcry, sometimes years after the abuse occurred. She explained that "[a] lot of children hold on because of fear," and then after a triggering event occurs, "they just can't hold on to it anymore." Green said that a nightmare can be a triggering event, as well as a symptom of trauma. She also said that is not uncommon for children to make incremental or partial outcries where they reveal additional information about the abuse over time as they become more comfortable discussing the incident. For example, she said that sometimes children provide additional details in their sexual assault exams that were not disclosed during their forensic interviews.

Alison, twenty-one years old at the time of trial, testified that Boson was a close family friend when she was a child. She described him as "an uncle figure" who "was over every weekend." She said that he was "[v]ery friendly" and "[a] bit touchy." Asked to elaborate, Alison said, "Lots of hugs. Lots of touching." She continued, "His hugs were very tight, very touchy in certain places, hands would slide and stuff like that." When asked what she meant by "certain places," Alison responded, "My bottom. My sides."

As for the incident in question, Alison alleged that, one night, around midnight, when she was "around nine or ten," she was trying to fall asleep in her bedroom at Father's house when she heard a person exit the nearby bathroom and open the door to

6

her room. Alison was lying on the top bunkbed, and her sister was on the bottom bunk. She felt her blanket being pulled down, and then someone began touching her "genitals" with their hand. She said the touching occurred under her clothes, and the person placed his fingers "[i]nside" her body. This lasted for twenty or thirty seconds, until she heard Father's door open, and then the person quickly left her room. Although her eyes were closed during the duration of the incident, she believed the person who touched her "inappropriately" must have been Boson because he "always slept" in her brother's bedroom, her brother was already asleep on the couch in the living room, and Father's bedroom was on the other side of the house. Finally, Alison testified that, "a few weeks later," the sisters confided in each other about what Boson had done to each of them but made a promise not to tell anybody.

On cross-examination, Boson's counsel suggested that Alison was an unreliable witness because she gave prior inconsistent statements about whether she witnessed Boson sexually assault Amanda. Alison agreed that she told Mother and the forensic interviewer that she witnessed Boson sexually assault Amanda. Counsel then pointed out that, according to her medical records, Alison subsequently gave a different account to Gaddis, saying "[she] didn't know it happened to [her] sister." Counsel asked her if she had in fact said that to Gaddis, and Alison responded, "I don't remember." Counsel then asked Alison if she remembered saying during interviews that the alleged incident with Amanda occurred in their bedroom, and Alison responded affirmatively. Counsel then asked Alison whether she was aware that Amanda was claiming that the incident occurred in their brother's bedroom, and she said, "No."

Before redirect began, the State approached the bench and asked the trial court for permission to question Alison further about what it described as potentially "a separate incident not listed in the indictment." The State acknowledged the discrepancy between Amanda's and Alison's versions of events but hypothesized that it "can be explained by it being a separate incident." The trial court agreed that Boson's counsel "opened the door" to further questioning about this possible extraneous offense.

During redirect, Alison described the incident she allegedly witnessed between Boson and Amanda in their bedroom:

> I was asleep. I thought it was a dream and I just saw someone standing over doing the same thing, a hand under the blanket, and then I just fall back asleep and the next thing I know my sister peed in the bed. And then she asked me about it and I asked her questions, and she said that she thought she had been touched and then we started talking about how I had the same thing happen to me and then we made that promise not to talk about it again.

Alison said she would not be surprised if Amanda had described a similar incident in their brother's bedroom because it was "likely" that there were two separate incidents involving her sister.

On recross, Boson's counsel asked Alison a single question: "Are you aware that [Amanda] gave a Children's Advocacy Center video statement stating that she was only touched one time?" Alison responded, "No."

Amanda, nineteen years old at the time of trial, described a single incident that occurred in her brother's room when she was "about the age of seven or eight." She had no recollection of a separate incident occurring in her bedroom. Like her previous statements to Mother and Gaddis, Amanda testified that she went to her brother's room one morning to watch television and eat chicken nuggets. Boson was sleeping in the

8

room, and her brother was sleeping in the living room. When Boson woke up, he began "touching" her "vagina" with "[h]is hands." Amanda was not sure whether her clothes were taken off or she was just wearing a nightgown, but she remembered Boson taking out his cell phone and using it to record or take pictures of her vagina. She could not recall if his fingers went "inside" her body, but she said, "I do know that [he] was opening the lips." The incident ended when she ran out of the room and got in bed with her sister.

Amanda further testified that Mother, not Alison, was the first person she talked to about the incident. She also said that she first learned of Alison's allegation after the police arrived, when Alison "sp[o]k[e] out and sa[id] that it happened to her." She had no recollection of Alison telling her about the incident before that day.

On cross examination, Amanda acknowledged that during her forensic interview she was asked whether Boson touched her inside, outside, or both, and she responded "outside." When counsel pointed out that she used the word "inside" to describe the touching during her subsequent medical exam, Amanda testified, "That, I'm not too sure of. I may have not been sure how to word it. Like I said, he was opening areas with his fingers."

For both counts, the jury was instructed on the offense of aggravated sexual assault of a child by digital penetration of the complainant's sexual organ and the lesser included offense of indecency with a child by sexual contact by touching the complainant's sexual organ. During deliberations, the jury sent a note asking for the definition of penetration. The trial court sent the following written response: "We can't define 'penetration' for you[.] It is up to each of you to define it."

9

The jury found Boson not guilty of either offense with respect to Alison and guilty of aggravated sexual assault with respect to Amanda. During the punishment phase of trial, the State suggested a sentence of "no less than 50 years," and Boson argued for something on "the lower [end] of the punishment range." The jury assessed Boson's punishment at twenty-two years. This appeal ensued.

## II.    LEGAL SUFFICIENCY

Boson first contends that the evidence was insufficient to support his conviction for aggravated sexual assault of a child because Amanda "described the event in different ways at different times, including the issue of whether penetration occurred, and [her] testimony was in frequent conflict with that of [Alison]."

## A.    Standard of Review & Applicable Law

To satisfy constitutional due process requirements, a criminal conviction must be supported by sufficient evidence. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). "Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a legal sufficiency review, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). We defer to the jury's role as the factfinder, which includes "resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic

facts." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007)). We consider "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray*, 457 S.W.3d at 448 (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). The uncorroborated testimony of a child victim alone is sufficient to support a conviction for a sexual offense. TEX. CODE CRIM. PROC. ANN. art. 38.07(b)(1).

We measure the sufficiency of the evidence against "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* The hypothetically correct jury charge in this case would require the jury to find beyond a reasonable doubt that Boson penetrated Amanda's sexual organ with his finger. *See* TEX. PENAL CODE ANN. § 21.02(b)).

As a statutorily undefined term, the Texas Court of Criminal Appeals has determined what constitutes "penetration" for purposes of aggravated sexual assault: "[M]ere contact with the outside of an object does not amount to a penetration of it. But pushing aside and reaching beneath a natural fold of skin into an area of the body not

11

usually exposed to view, even in nakedness, is a significant intrusion beyond mere external contact." *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992). Penetration may be proven by circumstantial evidence. *Villalon v. State*, 791 S.W.2d 130, 133 (Tex. Crim. App. 1990). Accordingly, the complainant need not explicitly testify that penetration occurred. *Id.* Evidence of the slightest penetration is sufficient to uphold a conviction, so long as it has been shown beyond a reasonable doubt. *Luna v. State*, 515 S.W.2d 271, 273 (Tex. Crim. App. 1974); *see also Bates v. State*, No. 13-18-00493-CR, 2020 WL 2079094, at *5 (Tex. App.—Corpus Christi–Edinburg Apr. 30, 2020, pet. ref'd) (mem. op., not designated for publication).

**B.     Analysis**

Based on their note, the jury was keenly focused on the penetration element of the offense during deliberations. According to the evidence presented at trial, Amanda told the forensic interviewer that Boson touched the "outside" of her genitals; she later told the nurse examiner that Boson touched her "inside"; and at trial, she could not recall if his fingers went "inside" her body, but she was certain "that [he] was opening [her] lips" while using his phone to record or take pictures of her vagina. Boson notes that "there was no testimony from [Amanda] regarding whether this was [done] by manipulating the vagina from outside or inside the labia majora." Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was legally sufficient to support Boson's conviction.

First, Green testified that it is not uncommon for a victim of sexual assault to reveal additional details during a sexual assault exam that were not provided during a previous

forensic interview, and the jury was free to credit Amanda's statement to Gaddis that Boson touched her genitals on the "inside" over her prior statement to the forensic interviewer that the touching occurred on the "outside." *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties."); *Adams v. State*, 502 S.W.3d 238, 244 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) ("We presume that the jury credited the SANE's testimony about the complainant's statement during the examination and that the jury resolved any inconsistency between that statement and the complainant's trial statement by concluding that the statement the complainant made to the SANE reflected the truth."); *In re A.B.*, 162 S.W.3d 598, (Tex. App.—El Paso 2005, no pet.) (holding the evidence was sufficient to support convictions for aggravated sexual assault where complainant testified that appellant used his fingers to touch her "front" and "bottom" on the "inside"). Even if Amanda had recanted at trial and testified that no penetration occurred, the jury would have been permitted to credit Amanda's statement to Gaddis over her recantation. *See Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) ("The outcry testimony here was sufficient to sustain Saldaña's conviction, and the jury was entitled to disbelieve B.B.'s inconsistent testimony at trial that Saldaña did not penetrate her sexual organ.").

But Amanda did not recant at trial. Instead, now testifying approximately five years after she made her statement to Gaddis, Amanda said she could not recall if Boson's fingers went "inside." However, she was steadfast that Boson "was opening areas with

13

his fingers." Based on this testimony, coupled with Amanda's prior statement to Gaddis, it was reasonable for the jury to infer that by "pushing aside" Amanda's labia majora, Boson "reach[ed] beneath a natural fold of skin into an area of the body not usually exposed to view." *See Vernon*, 841 S.W.2d at 409; *Green v. State*, 476 S.W.3d 440, 448 (Tex. Crim. App. 2015) (noting that an officer's testimony that appellant placed his finger "between the lips" of complainant's sexual organ was consistent with the definition of "penetration" provided in *Vernon*). We conclude that the evidence was legally sufficient to prove that Boson penetrated Amanda's sexual organ.

Boson also suggests that Alison's version of what occurred during and after Amanda's assault was so different than Amanda's version that reasonable doubt existed as to whether the assault occurred at all. Yet, it is clear from Alison's testimony that she believed she witnessed a separate assault between Boson and Amanda—not the one Boson was convicted of. Regardless, even if they were describing the same incident, the jury was allowed to take Amanda's testimony at face value and disbelieve everything Alison said. *See Chambers*, 805 S.W.2d at 461. And, of course, Amanda's testimony alone was sufficient to support Boson's conviction; the State was not required to corroborate Amanda's testimony through the testimony of Alison. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(b)(1). Boson's first issue is overruled.

### III. MISTRIAL

By his second issue, Boson claims that he was entitled to a mistrial because the testimony referring to him as a registered sex offender was so prejudicial that the trial court's jury instruction was insufficient to cure the harm.

**A.     Standard of Review & Applicable Law**

A mistrial is the trial court's remedy for improper conduct that is so harmful that the case must be redone. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.* We review a trial court's decision to deny a motion for mistrial for an abuse of discretion, and the ruling must be upheld if it falls within the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).

"Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial." *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (collecting cases). This general rule is built on the premise that a jury will follow the trial court's instructions. *Id.* For example, we will presume that a jury followed a trial court's instruction to disregard improper testimony. *E.g.*, *Waldo v. State*, 746 S.W.2d 750 (Tex. Crim. App. 1988) (jury presumed to follow instruction to disregard testimony regarding defendant's post-Miranda silence); *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (jury presumed to follow instruction after accomplice witness alluded to defendant's previous incarceration). The presumption is rebuttable, but to overcome the presumption, the appellant must point to evidence in the record demonstrating that the jury did not follow the trial court's instruction. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).

**B.     Preservation of Error**

As a threshold matter, the State argues that Boson waived this issue because he failed to object to the unredacted version of Alison's medical records before they were

15

admitted into evidence. *See Miller v. State*, No. 13-18-00191-CR, 2019 WL 5251146, at *3 (Tex. App.—Corpus Christi–Edinburg Oct. 17, 2019, no pet.) (mem. op., not designated for publication) (finding appellant waived complaint about trial court's denial of a mistrial where appellant failed to object to a 911 call log referring to appellant as a registered sex offender until the jury sent a note asking about the evidence during deliberations). According to the State, it was incumbent upon Boson to make sure that the State followed through on their agreement to redact the medical records before those exhibits were admitted into evidence. Both parties agree that the State tendered the exhibits to Boson's trial counsel before they were simultaneously admitted into evidence. The first exhibit (Amanda's medical records) had been redacted but the second one (Alison's medical records) had not, and Boson's counsel failed to catch the error before saying, "No objection, Your Honor." Once the error came to light through Pardo's testimony, Boson promptly objected. Although the State conceded error in the trial court and agreed to a post-submission redaction and an instruction to disregard the testimony, it now argues on appeal that Boson's objection was nonetheless untimely. Because we conclude that a mistrial was not warranted, we assume without deciding that this issue was preserved for appeal.

## C.    There is No Evidence that the Jury Failed to Follow the Instruction

Here, we have an isolated, inadvertent reference to an extraneous offense, and the trial court not only gave a prompt instruction to disregard the testimony but took it a step further by telling the jury that "Boson is not a registered sex offender." *See Sandoval v. State*, 665 S.W.3d 496, 529 (Tex. Crim. App. 2022) ("An instruction to disregard is more

16

likely to cure prejudice when the improper reference is isolated.") *cert. filed* (No. 23-5618). Boson contends that referring to him as a registered sex offender was particularly prejudicial because he was also charged with sex offenses in this case, thereby making it more likely that the jury would convict him based on this improper character conformity evidence. But even when the improper extraneous offense evidence indicates that the defendant committed the same or a similar offense in the past, an instruction to disregard is generally sufficient to cure any prejudice. *See Coe v. State*, 683 S.W.2d 431, 436 (Tex. Crim. App. 1984) (finding jury instruction to disregard officer's testimony referring to appellant's "other robberies" in aggravated robbery trial was sufficient to cure harm); *Long v. State*, 820 S.W.2d 888, 894 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) (concluding that witness testimony during a murder trial that appellant admitted to previously committing other murders did not warrant a mistrial because the trial court's instruction to disregard the testimony cured any error); *see also Brownlee v. State*, Nos. 11-08-00264-CR, 11-08-00265-CR, 11-08-00266-CR, 2010 WL 1952426, at *2 (Tex. App.—Eastland May 13, 2010, pet. ref'd) (mem. op., not designated for publication) (holding appellant charged with three counts of aggravated sexual assault of a child was not entitled to a mistrial when a testifying officer referred to him as a registered sex offender).

We therefore conclude that this case falls within the general rule, and we will presume that the jury followed the instruction to disregard the testimony unless Boson can point to some evidence in the record showing otherwise. *See Gamboa*, 296 S.W.3d at 580; *Colburn*, 966 S.W.2d at 520. Boson has failed to direct us to any such evidence,

17

and we find none. To the contrary, the fact that the jury returned a not guilty verdict on one of the two counts strongly suggests that they followed the instruction and based their verdicts on the evidence properly before them. Accordingly, the trial court did not abuse its discretion in denying Boson's motion for mistrial, and Boson's second issue is overruled.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Boson argues that his trial counsel's performance was constitutionally defective because: (1) he failed to ensure that Alison's medical records were redacted before being admitted into evidence; and (2) he introduced evidence of an uncharged sexual assault committed by Boson.

## A. Standard of Review & Applicable Law

The United States and Texas Constitutions guarantee a criminal defendant the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *see* TEX. CODE CRIM. PROC. ANN. art. 1.051. We evaluate claims of ineffective assistance of counsel using the two-pronged test from *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting *Strickland*). An appellant is required to show both: (1) "that counsel's performance was deficient"; and (2) "the deficient performance prejudiced" appellant. *Strickland*, 466 U.S. at 687. "Failure to satisfy either prong of the *Strickland* test is fatal." *Morrison v. State*, 575 S.W.3d 1, 24 (Tex. App.—Texarkana 2019, no pet.). Accordingly, a court may bypass the first prong, and decide the issue solely on the prejudice prong. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the

18

ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

"In order to satisfy the first prong, appellant must prove, by a preponderance of the evidence, that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms." *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). Such a showing "must be firmly founded in the record." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). We indulge "a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* "Trial counsel should generally be given an opportunity to explain his actions before being found ineffective." *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). "Thus, if the record does not contain affirmative evidence of trial counsel's reasoning or strategy, we presume counsel's performance was not deficient." *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021). "In the face of an undeveloped record, counsel should be found ineffective only if his conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Although a single egregious error may constitute ineffective assistance as a matter of law, we generally disregard isolated errors that are not indicative of the overall representation. *Lopez*, 343 S.W.3d at 143; *see Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990) ("Isolated instances in the record reflecting errors of commission or omission do not cause counsel to become ineffective, nor can ineffective assistance of counsel be established by isolating or separating out one portion of the trial counsel's performance for examination.").

Yet, even if the performance was deficient, such an error does not warrant setting aside the judgment if there has been no prejudicial effect on the outcome. *Strickland*, 466 U.S. at 691. "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695–96. "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. The test for prejudice requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In conducting our analysis, we consider the totality of the evidence before the factfinder. *Id.* at 695.

**B.    Analysis**

Boson first argues that Pardo never would have referred to him as a registered sex offender if his trial counsel had carefully inspected Alison's medical records before they were admitted into evidence. While we agree this isolated error could have been prevented, the totality of trial counsel's representation was certainly not deficient. *See Lopez*, 343 S.W.3d at 143; *Ex parte Welborn*, 785 S.W.2d at 393. Boson was acquitted on one of two charges and received a sentence that was less than half of what the State requested and on the lower end of the sentencing range. *See* TEX. PENAL CODE ANN. § 12.32(a) (setting the sentencing range for a first-degree felony at "imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or

20

less than 5 years"). Under the circumstances, this was a relatively good result that we largely attribute to trial counsel's overall effectiveness.

But even if we assumed that the error rendered counsel's performance objectively deficient, Boson still fails under the second *Strickland* prong. As discussed above, the trial court's instruction to disregard Pardo's reference to Boson as a registered sex offender cured any harm caused by trial counsel's error. Therefore, Boson cannot demonstrate that, but for trial counsel's error, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694.

Boson next argues that trial counsel unwittingly opened the door for Alison to testify about an unindicted offense Boson allegedly committed against Amanda. Prior to trial, Alison gave conflicting statements about whether she witnessed Boson assault Amanda. She had also claimed the assault occurred in the girls' bedroom, while Amanda had repeatedly said that the incident occurred in their brother's bedroom. Boson notes that, after counsel questioned Alison about these discrepancies, the trial court allowed the State to question Alison about the details of what she allegedly witnessed. According to Boson, Alison's subsequent description of what she believed to be a second sexual assault committed by Boson against Amanda was necessarily prejudicial to his defense.

Because Boson's ineffective assistance claim is being raised for the first time on appeal, counsel has not explicitly stated his subjective trial strategy on the record. However, this is not a case where we have to speculate about counsel's strategy. Throughout trial, from opening to closing statements, counsel drew the jury's attention to "the discrepancies and the contradictions and the changing of the stories" between Alison

21

and Amanda. In a case that hinged almost entirely on Alison's and Amanda's credibility, this was a sound trial strategy. *See Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (recognizing "that in prosecutions for sexual offenses, a successful conviction 'often depend[s] primarily on whether the jury believe[s] the complainant, turning the trial into a swearing match between the complainant and defendant'" (alteration in original) (citation omitted)); *Fuller v. State*, 224 S.W.3d 823, 837 (Tex. App.—Texarkana 2007, no pet.) (holding that trial counsel's failure to object to testimony bolstering a child sexual assault victim's truthfulness and credibility amounted to ineffective assistance because "[t]he only real issue is this case was the credibility of the witnesses, in particular the complaining witness").

Moreover, the strategy was apparently fruitful. At the risk of trying to glean too much from a cold record, we note that Alison's testimony about her own alleged assault was internally consistent and matched her prior statements. The only discrepancies in her testimony concerned her involvement with Amanda's assault. After Alison insisted that she witnessed a second assault between Boson and Amanda in the girls' bedroom, Amanda testified unequivocally that there was a single incident, it happened in a completely different manner than what Alison described, and it occurred in their brother's bedroom without anyone else present. Amanda also denied that she and Alison had confided in each other before Amanda made her outcry, another contradiction in Alison's testimony that Boson's trial counsel highlighted for the jury.

Based on their dueling verdicts, it appears that the jury arrived at the very conclusion that counsel was trying to lead them to—that Alison was not a credible witness.

In other words, the line of questioning Boson now complains about on appeal probably led to his acquittal on the count involving Alison and was immaterial to his conviction involving Amanda. Accordingly, Boson has failed to show that this complained-of line of questioning was unprofessional or prejudicial. *See Strickland*, 466 U.S. at 687. Boson's final issue is overruled.

## V.   CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
18th day of April, 2024.